Good afternoon. Illinois Appellate Court First District Court is now in session. The Sixth Division, the Honorable Justice Michael B. Hyman presiding, case number 23-1863 EBNB 70 Pine Owner Restaurant v. Firemen's Fund. Good afternoon. I'm Justice Michael B. Hyman. With me is Justice Carl Anthony Walker and Justice Celia Gamras. We will conduct this as if we were in the courtroom. Each side has 20 minutes. Appellant, you can reserve time for rebuttal. Tell us when you introduce yourself, how much time you wish. We are not real strict clock watchers, but usually 20 minutes is enough time, I think, in this case particularly with all the cases that have been decided, and we'll be discussing that. So if you each could introduce yourselves. Good afternoon, Your Honors. My name is Richard Craig and I represent the plaintiff EBNB 70 Pine Owner Restaurant. And how much time do you want for a rebuttal? If I could have five minutes, Your Honor. That's fine. Good afternoon, Your Honors. Thank you very much. My name is Brett Solberg. I represent the defendant Firemen's Fund Insurance Company. All right, thank you. Mr. Craig? Thank you. May it please the court, and good afternoon, counsel. May it please the court. We are here today because the trial court erroneously dismissed this declaratory judgment action at the pleading stage. It was wrong to dismiss the case at the pleading stage for three principal reasons. First, the trial court misapplied the line of cases beginning with Sweetberry Cafe versus Society Insurance. Second, we urge this honorable court to reconsider the analyses that underlie that line of cases. And if this court does so, then the trial court should not have to apply those cases as reasoned. And then finally, it was wrong to dismiss this because the policy at issue in this case provides for coverage under the facts as pled, irrespective of the COVID jurisprudence that has evolved throughout the country and in Illinois. So, beginning at the beginning, we urge the court to reconsider the Sweetberry line of cases, all of which interpreted the same policy language that's at issue in this case. Okay, let me stop you there. Sure. You, both parties agree, court agreed, Illinois and New York law are the same, correct? That's correct. Okay. And I needn't tell you that the highest court in New York recently, a few months ago, decided the question on the language that's at issue here. And in that decision, not only does it cite every, almost every district, every circuit court in the federal jurisdiction, but many cases, including the Sweet case in Illinois, and it comes down Now, if Illinois law and New York law are the same, and this decision seems to me doesn't give you much air, tell me why we shouldn't affirm. For two reasons. One, Illinois law is the same right now as New York, but it might not be. Our Supreme Court has not weighed in on it. Our Supreme Court might disagree, in which case, that's not for us to decide. We're not the Supreme Court. That's something that the Supreme Court could decide if you appeal. But as far as us, since the Supreme Court hasn't decided, and there is, I agree with your analysis, it's not well settled in Illinois. Okay. I don't think that's, that's not the issue. The issue is, what is the law? And again, one thing that is most notable in your reply is that you don't even mention consolidated. It's mentioned several times in the response, but you don't distinguish it or discuss it in your reply. So, you know, what, why not if that's the, that's the case that's facing you right now, because it is the highest court in a jurisdiction like Illinois with regard to these issues? Well, I, the reason I, I don't quite frankly remember if, if it had been issued when the reply brief was written. I just don't remember, Your Honor. I'm sorry. But, but the reply brief was filed on June 27th, 2024. And I have a copy of the opinion, which is February 15th, 2024. And not only that, as I said, it was mentioned several times in the reply, in response. So it did come down before. Okay. And I'm sorry for not remembering that, but it is the highest court in New York, the highest court in, and it's not binding on Illinois courts, the highest court in Illinois that has, that has reviewed these cases is Your Honors. So you, you, this court is not bound by the analysis in New York. I mean, it's pretty persuasive authority. That, that's the point. Absolutely. What you say is true. We're not bound because it's, courts are the same as us, but in Illinois, but the Supreme Court hasn't ruled. What again, how would you respond? I mean, why should we treat Illinois different than what happened in New York? Well, two reasons. One, with this case, like I mentioned in the beginning, this case could be decided on the language of this policy on its own, irrespective of New York, irrespective of the COVID jurisprudence nationwide. And that's because the language of this particular policy provides for coverage the way it's written. And so in that... How's it different from the couple of dozen cases cited in the New York highest court? Because without, as far as I know, without distinction or without, they all apply to the direct physical and the way it was defined by Travelers versus Alger in Illinois, and similarly in New York and elsewhere. But in this particular policy, and that would require the direct physical damage. If we were to apply that modifier to damage as written in this policy, it would write out a whole large section of the policy, which would be irrelevant to the coverage, because direct physical would be excluded in any event. Mr. Craig, I want to take you back for just a second. I didn't want to interrupt when you and Justice Hyman were dialoguing, but you want us to reconsider Sweet Barrier. You want us to rule differently, because you said the Supreme Court hasn't moved on this issue. And of course, we agree with you, but there was a petition for leave to appeal filed in that case, and the Supreme Court decided not to hear it. Now, that doesn't necessarily mean that they agree with it, but they had an opportunity to take a look at this issue that had never been decided by the Supreme Court in Illinois, and they decided to let the decision stand. Does that mean anything to you? Actually, it doesn't, and here's why, and this is what I can rely upon. I've experienced, I clerked for a judge on the Illinois Supreme Court coming out of law school. I've experienced the large stack on Monday morning of PLAs that we used to get. And I know what goes into the consideration of granting it or denying it, and it very well could, there could have been a number of reasons why it was granted or denied, one of which could have been because, as I point out in my principal brief, this case law in Illinois is not well settled, it's in its infancy. And it could be that the Supreme Court wanted to see, at that point, some more appellate court analyses to see if maybe another appellate court might disagree. And that was certainly a reason to grant PLAs back in the day. I'm sure it is today. And that is where the appellate courts have divergent opinions. I don't know that you can read a whole lot into the denial of the PLA. They deny the overwhelming majority of the PLAs. But that might be one reason, and that is that the Supreme Court might have wanted to let the appellate courts analyze this a little more, get a little bit a little bit more full jurisprudence in Illinois before considering it. That would be one reason that immediately comes to mind. In light of that, oh, go ahead. Oh, I'm sorry. So, Mr. Craig, you said that this language of this policy says direct loss or damage, and that's somehow different from the policy language in these other cases. I don't see it. Are you saying that those other policies say direct loss, direct damage? I don't see that. I see really consistency through those policies that say direct physical loss or damage, as does this policy. Agreed. Agreed. That's the way that the language is written in this policy and in all the other policies. They all say direct physical loss or damage. They do not modify the term damage. Agreed. But in this particular policy, the insurance company should have modified it if that's what they intended the term to mean. And if they had modified it, and that would have been the that term to read, then 22 of those exclusions could have been deleted because they would no longer be necessary. The fact that the insurance company felt need to exclude all of these things that would be irrelevant if in this particular policy, the direct physical applied to the term damage, then it should have applied that qualifier to the term and deleted the exceptions. So that's not typical in insurance policies, first of all. And second of all, the court never even reached the exclusions and could decide this case is based on the language, which you say is consistent around the country. Agreed. Agreed. I have another question on this line. According to the New York Highest Court, as of February, they said, to their knowledge, no appellate court has allowed an insurance coverage claim under similar policy terms to proceed past a motion to dismiss. None. Are you aware of any appellate court in the country that has countered that statement as of February 2024? I'm not aware. So you would agree, then, as we look across the country, this is settled law? I don't think anything can be settled in this short amount of time. I think that we are still in case laws. We remember your brief that you discussed that there must be at least five years before it can be considered settled law. Well, I use the term the number of years, five, because it's a nice round number, but it's certainly five years applies. Five years ago, nobody had ever heard of COVID. So it's an extraordinarily recent phenomenon. It is a disease about which we knew next to nothing when it hit us. And we are still, you know, at the tail end of getting through it. So part of the tail end of getting through it is allowing cases like this to make their way through the courts. But before COVID came, since during World War II is when flu became a thing, and it kills thousands of people in the country every year and has. And it's very contagious. There are other colds, people have colds. And we know that when people sneeze, there's germs that get on tables and food and so forth. I mean, talking about a restaurant, you know, not what your argument, if it follows your logic, it seems, why wouldn't it apply to any flu, any cold, any kind of virus that can contaminate the air? Principally, because as far as I know, there has been no discernible loss. Nobody has shut down America because of the flu. I mean, a lot of restaurants didn't shut down. So, you know, to say that that was a voluntary act, some restaurants stayed open, there are other ways to serve food outside. Not in New York. In New York, my client was shut down for over a year, could not do anything. But because of the government order, right? Well, government order because of if the restaurant, the tables had not been damaged by the COVID virus, there would have been no need for it. The reason they were shut down was because for over a year was because the property was damaged, such that it was unsafe to conduct normal restaurant businesses. And then in the government appropriately, it doesn't make any sense, because you can wipe down a table, you can put in new filters in buildings, that if restaurants, there are no grocery stores, they're all shut down. I mean, I don't know, that doesn't seem to be part of this case, that shutdown. I didn't see that as being a major issue here. Is it? Well, now you're discussing the ease of remediation. And there's no question that COVID is easily remediated. Like you say, you can just wipe it down. But it's still in the air, it is immediately damaged. It's an ongoing thing. So is the cold and so is the flu. But a cold and the flu do not give rise to insurance coverage, because nobody is incurring business losses because of cold or influenza. We don't know that. But again, under your analysis, they could. And they would ask because they have to remunerate the system and other things. But I just want to, on the government order, you're not saying that's any part of this case. Is that relevant at all to? The government order does not give rise to coverage, if that answers your question. Right. And we know in Illinois, what the state just recently, Supreme Court recently said about government order. So that's pretty clear. Right. And we're not claiming that a governmental order is the basis for coverage. Okay. So that has... Mr. Craig, you raised the point just a second ago of how New York is different. And you're asking us not to follow Sweetberry. And you believe that we should find that it was wrong, we decided. If we were to do that, how would that impact our analysis? Because we'd have to then deal with the issue of choice of laws. And talk to us, speak with us a little bit about how that would apply. If Illinois and New York were to have different law, then we would have to apply a choice of law analysis. There was some preliminary discussion in the... It wasn't discussed at the trial end. It was a preliminary, but not full discussion in the appellate court. My... What I would urge Illinois to do is to decide its law. Decide what the law is in Illinois, irrespective of whether in one particular case, we would have to undergo a choice of law analysis. Well, didn't Sweetberry do that though? What's that? It decided what the law is in Illinois. It did. There's no question about it. That's what we're... There's no question about it. We're asking the court to reconsider. The trial court has a right to do that. And then it goes to the appellate court and they have a right to do that. And then the Supreme Court has a... Every time a case goes before a judge, the judge has a right to decide what the law is. Except that in this case, the trial court could not... It had to apply Sweetberry because a superior court has issued that. So it could not... It was... And that's why we had to concede the Sweetberry analyses at the trial level while preserving the argument for appeal because the trial court is bound by the appellate court decision. So the trial court with the appellate court, you are vested with full authority to reconsider whether those cases were properly decided. But wouldn't the same argument you made to us apply in Sweetberry... Not apply when you were the trial court. You told the trial court, well, our case is different. Well, this is not Sweetberry. This is different. That's what you told us. That's one of the first words out of your mouth. And now you're saying, well, apparently it is because you conceded that Sweetberry applied and you had to follow it. We... Both arguments were made. So we had to concede. Again, I mean, both arguments were made, but you were also saying, well, Sweetberry, yeah, it covers it. I mean, you were saying both things, but yeah. Well, I don't... If I'm saying both things and sounding disingenuous, then I'm not saying it very well. And I'm sorry. At the trial level, we had to concede the applicability of Sweetberry in the line of cases because the appellate court issued it. But we also urged that the policy by itself provided coverage. I don't understand that. I don't understand why you would concede Sweetberry if your case is different. That's why we distinguish cases. Usually in the trial court, if your case is not like an appellate court case, you distinguish it. But you're saying, no, we conceded that concession. We just conceded it. Well, then I'm sorry for speaking poorly. The analysis that the direct physical loss and damage, that's consistent between Sweetberry, that's in ABW, that's in Lee. Well, not necessarily so much in Lee because of the allegations in Lee, but certainly in Sweetberry and ABW. The trial court was bound by the appellate court's interpretation of that phrase. It's word for word the same. And we pointed that out. We said, okay, Sweetberry exists, but we preserve that argument for appeal. But then we also argued at the trial level that this particular policy, irrespective of the COVID jurisprudence, this particular policy, if you just read it, provides coverage. Why does it provide coverage? I'm still not understanding that. Why this particular policy, which is the same language as the rest of the policies, why is this particular policy different? Because of the policy as a whole and because of the very basic rule of contract construction, where we do not read terms of a contract as superfluous or unnecessary. In those policies, they did not have 22, what would be superfluous exclusions, which rendered this policy different from those policies because it is evincing an intent to cover damage outside the scope of how it was defined by Travelers v. Alger, where Travelers v. Alger basically established a standard where you'd have to basically see the damage with your naked eye. And none of those exceptions would ever come into play if that was the definition of damage in this particular policy. Because we do not read into contracts, including policies of insurance, terms as superfluous and unnecessary, we have to say, well, why did they include this stuff? Well, it must be the only explanation is that the scope of damage is broader than the Travelers v. Alger definition. And certainly to the extent that there's an ambiguity, my client is entitled to reading it in its favor. So I disagree with you saying that those other policies did not have exclusions. These policies are very, very consistent in terms of the base of coverage. And so I don't know if those policies had 10 or if they had the full 22, but surely they had exclusions where you could make that same argument. I don't know that we can know that. I don't think that that was ever. Well, how do you know that? How do you know that? So you had mentioned something previously where you admitted COVID is easily remediated. You wipe it up. And then you said, but it's in the air. And that's the difference. Doesn't this policy have a specific exclusion about air? It does. But we're not saying that air is the damage. What we're saying is, and it's spelled out in great detail in the complaint, paragraph after paragraph about how when COVID settles onto physical property tables, it damages the tables. Now the damage might be. Let me just stop you. The damage, it does not require any sort of cases around this country have said, that's not physical loss or damage. That's what they have said. Wiping it up with a Clorox wipe is not. This is not where you have to throw out the tables, get new tables. You don't see a hole with acid bleeding through the tables or anything of that nature. I agree with you. So now we're talking about a difference in degree of damage. It is, there's no question it's damage. Now it might not meet the Elger travelers versus Elger definition of physical damage, which is why I urge in this case, that this policy, if it wanted the term physical to apply to the term damage, it should have written it in there. And it didn't. And if it had, then it wouldn't have had to have all these exclusions that have to do with physical damage. The only reason those, I'm sorry. No, I was just going to, if you could, you've gone over the time and you could, is there anything you want to mention and then close? No, for the reasons set forth in the briefs and in oral argument today, we would urge the relief request. Thank you. And you still have your five minutes. Thank you. Thank you. I was made pleased to court. Your honors have covered the vast majority with your questions of my presentation. I would like to answer one question judge Hyman had for my colleague of whether or not any of the cases on the appellate level have ever held in favor of his client's position. The answer is there have been two, one in Louisiana and one in California, both of which were subsequently reversed or overruled by the Supreme courts of both of those states. We now have a total of 17 Supreme courts, including states as disparate as Ohio, Alaska, California, Delaware, Iowa, Louisiana, Oklahoma, Massachusetts, and one South Carolina that was this exact policy. I argued it. It was a pinnacle policy from fireman's fund. All these arguments were made, including the exclusion arguments. The court overruled them all. In fact, this, very policy has been subject to dozens, if not hundreds of lawsuits across the country. And we have decisions from the first, third, fifth, seventh, and ninth circuits, as well as the South Carolina Supreme court and various other states, state appellate, intermediate appellate courts, all of whom have affirmed dismissal at the pleading stage. COVID-19 doesn't do anything to property. It doesn't affect it in any negative way. But Mr. Soberg, I think Mr. Craig is arguing that there is some damage because once the virus lands on tables or once it's in the air, that's the damage he's referring to. And he also says that many of those other policies that you're referring to, they only provided for direct physical loss. They did not refer to damage. He argued that today, and he also states that in his brief. Well, I'll take the second point first, if you don't mind, your honor. All of these policies, the language of direct physical loss or damage has been the standard policy language for commercial property policies for the past at least 50 to 75 years in this country. I am not aware of a single of the 288 appellate opinions currently as of today issued. I'm not aware of a single one of those policies. And I've read every one of those cases that was just direct physical loss. Direct physical loss or damage, sometimes it's direct physical loss of or damage to. That's another variation of this language. No court that's addressed the difference has ever held that that difference matters. The addition of those two prepositions has any effect. But I am unaware of any other policy that would align with what Mr. Craig is arguing. I think what Mr. Craig is arguing is really that the policy should say direct physical loss or direct physical damage to property. And that we can't take the modifier direct and physical and apply it to both loss and damage. We briefed that in the brief, the Supreme Court in Nevada in particular spent about four pages and went through Brian Garner and Justice Scalia's book about interpreting law and explained that when you have a modifier like that, especially when it's followed by a preposition, that modifier applies to all of the things being modified in the sequence. In this case, it would be loss or damage. There hasn't been a single court. No court has followed. But we've already discussed it. Yes. That's correct. And so to answer your first question, Justice Walker, about the COVID-19 landing on a surface, the only allegations are that it lands on a surface and it makes that surface potentially infectious to a human being. That's no different than salmonella. That's no different than norovirus, which on a cruise ship can be a very unpleasant cruise. It's no different than any other virus that would have been, you know, every sneeze would be an insurance claim if that were the case. It doesn't alter, it doesn't change the structure. It's like dust sitting on the top of a surface. There's no allegation in this complaint that it does anything other than sit there and make the surface potentially infectious. That's not, doesn't meet this state's test for changing the appearance, shape, color, structure, other material dimension of property, nor does it meet New York's test. And at the end of the day, your honors, if you decide Sweetberry and all 16 decisions, including two decisions from this very division on this issue are wrong, in this case, your honors have to do a choice of a choice of law analysis. And the choice of law analysis is clear. We don't disagree on any of the factors. They all point to New York. And New York law is 100% decided. In fact, even if we didn't have the high court's decision, there hasn't been a single court, state, federal, district, appellate division, or court of appeals that has disagreed on this issue. Every single judge who has addressed this now and into the many score of decisions have all agreed that the presence of COVID-19 does not meet the test because it's ephemeral, because you don't have to repair, rebuild, or replace. That's what separates it from asbestos, from noxious fumes, from odors, the things that are perceptible and tangible that have to be, you know, repaired, rebuilt, or replaced in order to make the structure usable again. I'm sorry, Justice, go ahead. I wanted to go to a different issue. It's an issue that you haven't been able to respond to because it was in the reply brief. But I think it's important enough it was the first argument they made and they wanted to strike your brief. What's your response to that? Well, my apologies on that, your honor. We did not mean to... But did you violate anything? No, my question is, have you violated it? Am I wrong that your pica, I looked at it and tried to measure it, but on the paper, it looks 14 and not 12, which is a fine. The court allows it, and particularly for some of us have older eyes, and the higher, the larger pica can be helpful. So you get less words on the page. Correct, correct, your honor. We're well under the word count. And we did make the brief because I'm the same way. I don't have my reading glasses on now, but I prefer 14 point font. And that's just what we've done in all the briefs that we filed in the country. There's nothing wrong with it. The world provides for it. The other thing was that single space, which is allowed. But as I read the opening brief, particularly of the appellant, they had four or five pages in a row that was single spaced. Correct, where they quoted their own complaint, your honor. And I chose not to respond to any of those complaints that my colleague put in the reply simply because I didn't think they were necessarily worthy of response. And we would have been happy to make corrections if the court required it. I think striking the brief would be... That's not what I'm saying. Whether it's a real issue here, we're not... I can tell you that we're not going to... We have this argument. If we were going to have this argument, we're going to strike the brief. So that's not an issue. But I think it's an issue that's been brought up. And so we can't just simply ignore it. So that's why I wanted to get your... No, I understand your honor. And no, we don't think we fail to comply with any of the spacing rules or any of the pagination rules, nor do we think that we're both under the page limit. And if we do a word count, we're well under the word count. Further, there were just so many cases in this universe. Keeping them straight is, for me, a full-time job, has been for the last three years. And a lot of times in rebutting arguments, it doesn't make sense for me to do it. It makes sense to say, well, you don't take my word for it. Look at what the Nevada Supreme Court said, or the Alaska Supreme Court. And so we end up with a brief that's unusually full of fairly lengthy quotations. And that's really why there was a lot of singles spaced. To me, what that suggests, and I like your views because of this, is that the Illinois Supreme Court should change the rules. Just make it 50,000 words, if that's what they want, because when the rule came into effect, we didn't have the ability to count words as accurately as we do today, and everybody can get words today. So that makes a lot more sense than pages, and we don't have to worry about all that, particularly the typeface and the type size is organized. I would very much endorse that change, Your Honor. I think that makes a lot of sense. We might be able to have an agreement. I don't know. Mr. Craig might agree with it. We'll find out. But I don't mean to interrupt you. Is there anything else you want to say? Not at all, Your Honor. If you have no more further questions, I'm happy to yield back the balance of my time to the court. Okay. Thank you, Mr. Craig. Thank you very much, Your Honor. We've discussed it. There was really only one thing that was said on the response that, and again, I mentioned it in the principal argument anyway, but counsel is correct when he says that what I am arguing is that if they want a direct physical to apply to damage in this particular policy, they should have put it in there. And so he's correct. And the reason I say that is because in Illinois, we have Travelers v. Alger that has told us what physical means. And that term, if it had been inserted and had meant to apply to damage, then would render the 22 exceptions that we cite superfluous. That's really the only, unless the court has questions, that's the only thing that came to mind to readdress. I just wanted to know what your reaction is to the spacing, whether 50,000 words, having served in the Supreme Court as a clerk. And do you think that that makes more sense? Oh, well, yeah, I totally agree with what you said there. I don't think I would have said anything except that it should have been one and a quarter inches on the left. And on mine, it got squeezed on the left side. But that's because I can't see anything. So I'll adopt the 14 pica, right? 14 pica and 50,000 words and forget the page limit. I'm with you entirely. So that's my thoughts on that. And I would be happy to share any other thoughts on anything if the court has any inquiries on it. I have a quick question. So you keep using the word damage saying, Judge, we have damage, but doesn't your damage have to be to the property itself? In other words, you don't want us to use the modifiers of direct physical for damage. And you're saying, but it's still damage. What's the damage to the property? I'm glad you asked that, because actually, that is a second thing that I would, because there was on the response argument, a suggestion that COVID is the same as dust. Dust is not damaged. Dust has never been damaged. Damage is something that does not result in a total loss. It is something that damages property that can be remediated. COVID, when it lands on tables, needs to be remediated. Now, it's easily remediated. That just goes to the degree. But Your Honor, the remediation, the damage is the damage to the table that needs to be remediated. And then with regard to COVID, it needs to be remediated over and over again. You can remediate it. And if people sit down at the table, and then the next people aren't going to want to sit down until it's remediated. Mr. Craig, that goes right back to Justice Hyman's point about the flu or cold. Somebody sneezes on the table, you need to wipe it up. Otherwise, the next person might touch it and get sick. There is really no difference. What's the damage to the property? Well, the damage to the property is to the table. And the difference between flu is that nobody has damage leading to a year of closed restaurants because of the flu. But in this situation, because of the damage to the tables, because of the COVID damage to the tables, there was significant covered damage that should have been paid out under this all risk policy. And so under your argument, what do you want damage? You think your damages would be the Clorox wipes? Or because that would be traceable too, correct? No. Oh, I'm glad you asked that too. No, because the same policy says that while the property is damaged, you recover loss of business during the suspension of the business while you had to remediate the damage. During the period of restoration. Correct. So you wipe down the table, you remediate the damage. The damage immediately comes back because that's the nature of COVID. You wipe it down. It is an ongoing period where the tables get damaged. And the language of the policy says that during the period that you lose because of damage, you get recovered. So it's not the Clorox wipes that we would be seeking. Your business was not closed because of damage. Your business was closed because of the government order. We've already gone over that. Well, you're trying to bring that in and you said that that's irrelevant. Well, I think that's cart before the horse, very respectfully. The reason the government, the government should shut, just like if we have a house. But still the government shut down that shut it down. I mean, I've been going to restaurants for a long time. So is everybody here. And I would hope that I have never gone to a restaurant that doesn't wipe down the table when somebody leaves. Usually they don't leave the dirty linens on. They take the linens off. If it's a table, I have always said, don't sit down yet. I got to wipe it off. It's always done in restaurants. And I assume it was done in the restaurants you represent. So that is part of business is wiping down tables, whether it's COVID or anything else. Fair. That's a fair observation. That by itself, that's just hygiene. That's just that's just cleanliness. That's different than. So with the government involvement here, it's akin to if I have a house here in the city of Chicago and the roof collapses, the government appropriately comes in and doesn't allow anybody into the house because there is a clear, there is a dangerous and hazardous condition that exists in the house. But we're not letting. That's physical damage though. That is physical damage. Well, that's what I mean. Well, this is not, I mean, as Justice Gamrat said, the table remains a table. The shine, the whatever, it's still the same. Well, that's why the term physical is so important here. Why physical, if it was going to modify damage should have been included in the language in this particular policy, because left out damage is just simply something damaged property that needs to be remediated. And there's no question that this needed to be remediated because the whole thing is how easily it's remediated. Everyone says, oh, it's easily remediated. Well, that kind of gives away the store because if it's easily remediated, that means it's damaged. It's damaged, but easily remediated. And once you say it's damaged, but easily remediated, well, then you fall right within the scope of the policy as written by the defendant. Thank you very much. Thank you. On behalf of the panel, I want to thank both of you very much. I'm glad that we at least agreed to 50,000 words and 14 Pete Pica, or 12, but we'll take the case under advisement and be deciding the case worthwhile.